No. 128,896

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

UNITED KANSAS, INC., *et al.*,
*Appellants*,

v.

SCOTT SCHWAB, *et al.*,
*Appellees*.

SYLLABUS BY THE COURT

1.

When presented with a potential conflict between the state's charge with determining the methodology of elections and an allegation that the chosen methodology impermissibly infringes the right to speech and assembly under the Kansas Constitution, Kansas courts must weigh the nature and severity of the burdens the challenged laws impose upon the plaintiffs' rights against the state's interests in adopting those laws.

2.

Ballot laws imposing severe burdens on plaintiffs' rights are subject to strict scrutiny; they may be upheld only when they are narrowly tailored and advance a compelling state interest. When the burdens imposed are less severe—when the challenged ballot law imposes only reasonable, nondiscriminatory restrictions on the plaintiffs' rights and leaves open alternative avenues for expressing the plaintiffs' views— the state's important regulatory interests are sufficient to sustain those requirements. When the ballot law imposes only slight burdens (or no burdens) on the plaintiffs' expression, those laws (like any other voting laws) should be upheld so long as they bear a reasonable relationship to the legislature's regulation of voting methodology under the Kansas Constitution and support legitimate ends.

1

3.

It is a fundamental tenet of federalism that state courts may interpret provisions of their state constitutions independently from how federal courts might interpret similar or corresponding provisions of the United States Constitution.

4.

The Kansas Supreme Court has recognized the possibility that section 11 of the Kansas Constitution Bill of Rights may protect broader speech or expression than the First Amendment to the United States Constitution. But the mere possibility that a state constitutional provision could provide greater protection in some instances does not mean that the state and federal protections differ meaningfully in every case.

5.

The difference in language and history between section 3 of the Kansas Constitution Bill of Rights and the First Amendment demonstrates an intention to protect a broader array of assembly rights under the Kansas Constitution than under federal law.

6.

The ballot restrictions contained in K.S.A. 25-306, K.S.A. 25-306e, and K.S.A. 25-613—which together require a person to accept only one political party's nomination for elected office and appear on the ballot only once—do not violate the members of a political party's expression and assembly rights under sections 3 and 11 of the Kansas Constitution Bill of Rights, as they serve important state interests that justify the burdens placed on the party's desired avenue of communicating its goals.

Appeal from Saline District Court; JARED B. JOHNSON, judge. Oral argument held February 24, 2026. Opinion filed August 14, 2026. Affirmed.

*Ori Lev,* pro hac vice*, Beau C. Tremitiere,* pro hac vice*, Farbod K. Faraji,* pro hac vice*,* and *Cameron O. Kistler*, pro hac vice, of Protect Democracy United, of Washington, D.C.; and *Rex Sharp* and *Ruth Anne French-Hodson*, of Sharp Law LLP, of Prairie Village, for appellants Brent Lewis, Elizabeth Long, Scott Morgan, and Adeline Ollenberger.

*Scott B. Poor* and *Sarah Foster*, of Hartenstein Poor & Foster LLC, of Wichita, for appellants United Kansas, Jack Curtis, Sally Cauble, Lori Blake, and Jason Probst.

*Bradley J. Schlozman* and *Garrett R. Roe*, of Hinkle Law Firm LLC, of Wichita, and *Anthony J. Powell*, solicitor general, for appellees.

*Jeffrey M. Kuhlman*, of Great Bend, and *Jason Torchinsky*, pro hac vice, and *Alexander Lee*, pro hac vice, of Washington, D.C., for amicus curiae Honest Elections Project, Inc.

*Edward D. Greim, Matthew Mueller*, and *Michael Scott*, of Graves Garret Greim LLC, of Kansas City, Missouri, for amicus curiae Center for Election Confidence, Inc.

*Joshua A. Ney*, of KN Law Group, of Olathe, and *Samuel Swanson*, pro hac vice, of Public Interest Legal Foundation, Inc., of Alexandria, Virginia, for amici curiae Public Interest Legal Foundation, Inc., and The American Constitutional Rights Union.

Before WARNER, C.J., MALONE and HILL, JJ.

WARNER, C.J.: This appeal presents a question fundamental to the core of our Republic. What is the purpose of a ballot during an election? Is it merely a means for the government to count the people's choices? Or is it also a platform for candidates and political parties to communicate their broader views and philosophical preferences to voters and elected leaders?

For the last 125 years, Kansas has taken the former view: Ballots are straightforward tools by which the people can vote for their leaders and the government can count those votes. Under Kansas law, each candidate for elected office may appear

3

on a ballot only once. And each candidate must choose the political party, if any, listed by their name.

The plaintiffs in this case—United Kansas, Inc. (a political party), two candidates that the party would like to support, and several voters in Saline and Reno Counties—challenge these two requirements. They claim the current ballot system makes it virtually impossible for any candidate to be elected if they do not run as a Democrat or Republican. The result, they assert, is an infringement on their constitutional rights to speech and assembly under our Kansas Constitution.

But the Kansas Constitution's protections, though indeed broad, do not prevent the state from adopting rules to safeguard elections. As the district court recognized in rejecting the plaintiffs' claims, while the state could have selected a different ballot method to conduct our elections, the straightforward ballot method does not violate the plaintiffs' constitutional rights. We thus affirm the district court's judgment.

AN OVERVIEW OF FUSION VOTING

At its heart, this appeal challenges Kansas statutes that for over 100 years have codified the state's policy against "fusion voting"—the nomination by more than one political party of the same candidate for the same office in the same general election. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354 n.1, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997).

"Fusion was a regular feature of Gilded Age American politics." 520 U.S. at 356. This practice was particularly common in the West and Midwest, where candidates of issue-oriented parties like the Populists often succeeded through fusion with a major party. 520 U.S. at 356 (citing Argersinger, *"A Place on the Ballot": Fusion Politics and Antifusion Laws*, 85 Am. Hist. Rev. 287, 288-290 [1980]). Fusion was particularly

4

common during this time at least in part because political parties printed and distributed their own ballots, which contained only the names of a particular party's candidates—thus a voter might "drop his party's ticket in the ballot box without even knowing that his party's candidates were supported by other parties as well." 520 U.S. at 356. "But after the 1888 presidential election, which was widely regarded as having been plagued by fraud, many states moved to the 'Australian ballot system'"—where an official ballot that contained the names of all legally nominated candidates and their parties was printed (at a cost borne by the public) and distributed by public officials at polling places. 520 U.S. at 356. Around the same time, "many States enacted other election-related reforms, including bans on fusion candidacies." 520 U.S. at 356. Today "fusion has become the exception, not the rule." 520 U.S. at 357.

Only four states expressly allow fusion voting on general election ballots: Connecticut, New York, Oregon, and Vermont. Conn. Gen. Stat. §§ 9-242, 9-453t; N.Y. Elec. Law §§ 6-120, 6-146, 9-112(4); Or. Rev. Stat. § 254.135; Vt. Stat. Ann. tit. 17, § 2474. Most states have outlawed fusion voting, with several bans existing for over a century:

- Fifteen states, including Kansas, expressly prohibit fusion candidacies in at least some elections. K.S.A. 25-213(c); Del. Code Ann. tit. 15, § 4108; Ga. Code Ann. § 21-2-137; 10 Ill. Comp. Stat. § 5/7-12(9); Ind. Code § 3-10-1-15; Ky. Rev. Stat. Ann. § 118.335; La. Stat. Ann. § 18:1280.25; Minn. Stat. § 204B.06; Mo. Rev. Stat. § 115.351; Neb. Rev. Stat. § 32-612(3); 25 Pa. Stat. § 2870(f); S.C. Code Ann. § 7-11-10(C); Tenn. Code Ann. § 2-5-101(f)(1); Tex. Elec. Code Ann. § 162.015(a); Wis. Stat. § 8.15(7).

- Four states allow a candidate to accept only one nomination. See Iowa Code § 49.39; Mich. Comp. Laws § 168.692; Mont. Code Ann. § 13-10-303; N.D. Cent. Code § 16.1-12-06.

- Nineteen states and the District of Columbia effectively prohibit fusion tickets by requiring that a candidate be registered in the party from which they seek nomination or preventing party switching within the same year. See Ala. Code § 17-9-3; Alaska Stat. § 15.25.030(a)(14); Ariz. Rev. Stat. Ann. § 16-311(A); Cal. Elec. Code § 8002.5(a); Colo. Rev. Stat. § 1-4-601(4)(a); D.C. Code § 1-1001.08; Fla. Stat. § 99.021(1)(b); Haw. Rev. Stat. § 12-3(a)(7); Me. Rev. Stat. tit. 21-A, § 334; Md. Code Ann., Election Law, § 5-203; Mass. Gen. Laws Ann. ch. 53, § 48; Nev. Rev. Stat. § 293.177(2)(a); N.H. Rev. Stat. Ann. § 655:14; N.M. Stat. Ann. § 1-8-2(D); N.C. Gen. Stat. § 163-106; Ohio Rev. Code Ann. § 3513.07; Okla. Stat. tit. 26, § 5-105; R.I. Gen. Laws § 17-14-1(9); W. Va. Code § 3-5-7(d)(6); Wyo. Stat. Ann. § 22-5-204.

Kansas first adopted a government-run (or Australian) ballot system for statewide elections in 1893. See L. 1893, ch. 78, § 8. But the following presidential election in 1896 raised questions about the workability of that system without further reforms. In that election, the Democratic-Populist presidential nominee, William Jennings Bryan, had different vice-presidential running mates from the Democratic and Populist parties.

In 1901, the Kansas Legislature enacted several additional election reforms, including the two the plaintiffs are challenging here. L. 1901, ch. 177, §§ 5, 6. As a result of these changes, which are still in effect today, a person running for office can only accept one party's nomination. K.S.A. 25-306(a). If multiple parties nominate the same person for the same office, the nominee must choose which nomination to accept (and accompany their name on the ballot); the person is then "deemed to have declined any other nomination." K.S.A. 25-306e. And the name of each candidate can be printed only once on the ballot. K.S.A. 25-613.

PLAINTIFFS' CHALLENGES TO THESE BALLOT REQUIREMENTS

The current appeal arose from lawsuits filed in two counties in 2024. In each lawsuit, the plaintiffs sued the Kansas Secretary of State and the county election officer in their official capacities, challenging these "anti-fusion" policies. In each case, the plaintiffs claimed that these policies violated sections of the Kansas Constitution Bill of Rights relating to equal protection and freedom of speech and assembly. Our Supreme Court consolidated the two cases before the district court in Saline County.

In the petitions, United Kansas described itself as a "moderate political party recognized by the State of Kansas" that "was formed to provide a political home for those who believe that there is wisdom on the left and the right but that both major parties must stop indulging extreme and fringe views on their respective sides." Most plaintiffs are voters registered with the United Kansas Party, and some also serve in leadership roles within the party.

United Kansas explained in its petitions that it nominated plaintiff Lori Blake as its candidate in the 69th House District and plaintiff Jason Probst as its candidate in the 102nd House District in the 2024 election. Both Blake and Probst were also "virtually guaranteed to win the Democratic nomination," as they were both incumbents running unopposed in their respective primaries. The Secretary sent a letter to Blake and Probst in June 2024, indicating that two Kansas statutes—K.S.A. 25-306e and K.S.A. 25-613— required them to choose one party with whom to affiliate on the general election ballot. Both candidates opted to be listed as the nominee for the Democratic party.

In their petitions, the plaintiffs argue that these two statutes, which prohibit listing a candidate more than once on a ballot and require a candidate to choose one nomination to be listed by their name on a ballot, violate sections 2, 3, and 11 of the Kansas Constitution Bill of Rights. The plaintiffs describe these statutes as "anti-fusion laws" and

7

claim they had the combined effect of nullifying the United Kansas nominations and thus stifling the party's political speech.

The defendants moved to dismiss the suits on several bases. Most notably, they claimed that these laws did not violate the Kansas Constitution and instead played an important role in ensuring Kansas had fair and understandable ballots in its elections. The plaintiffs opposed dismissal and sought summary judgment on their constitutional claims.

The district court held a hearing on the parties' various claims and ultimately granted the defendants' motion to dismiss. Relevant to our discussion here, the court found that the state has several legitimate interests in prohibiting fusion voting, including:

- preventing candidates from exploiting fusion voting by associating their name with popular slogans and catchphrases on the ballot;

- avoiding or minimizing the potential for gamesmanship at the nomination stage and improperly inflating party support;

- avoiding loss of competition and choice that could come from minor parties selecting already-popular candidates of major parties instead of identifying new candidates to represent the party;

- promoting stability in the political system by tempering the destabilizing effects of party-splitting and excessive factionalism;

- avoiding diminished accountability and voter confidence that could come from blurring the distinction between the parties and their platforms; and

- preventing voter confusion.

The court found that the state's ballot policies did not violate the Kansas Constitution's protections of speech or assembly, as "[n]othing in the law prohibits or prevents Plaintiffs from expressing support—financial or otherwise—for [United Kansas] and its preferred candidates at every stage of the race," as it still has access to "[t]he full range of activities available to communicate such support" such as identifying the candidates it supports as "the endorsed nominees of the party." The court explained that these laws do not restrict United Kansas' access to the ballot because United Kansas still has a right to nominate the candidate of its choice on the general election ballot. That candidate will appear on the ballot as United Kansas' nominee so long as that person has not already been nominated as the candidate of another party or declined United Kansas' nomination. The court similarly discussed and dismissed United Kansas' claim under the Equal Protection Clause.

DISCUSSION

The plaintiffs have now appealed, challenging the district court's conclusions that the Kansas ballot laws do not run afoul of their rights to speech and assembly under the Kansas Constitution. (The plaintiffs have not appealed the district court's ruling under the Kansas Constitution's Equal Protection Clause.)

As a preliminary matter, the defendants argue that although the plaintiffs describe their claims as constitutional challenges, the plaintiffs are in actuality contesting the legislature's policy against fusion voting. They point out that the wisdom of the legislative choice regarding the ballot structure—and whether one type of voting method is better than another or more likely to result in different outcomes for a party or candidate—is a political determination and thus not a justiciable question. We agree that questions regarding how a ballot should be structured and the method for a candidate to select a nomination are judgments left to legislative prerogative. But the plaintiffs here do not directly challenge those policy judgments; instead, they argued that the policies

9

against fusion voting codified in the Kansas statutes infringe their constitutional rights to freedom of speech and assembly. Whether a statute violates the Kansas Constitution is a question suitable for judicial review. See *Gannon v. State*, 298 Kan. 1107, 1172, 319 P.3d 1196 (2014). We thus turn to the constitutional claims presented here.

1. *When faced with a potential conflict between two provisions under the Kansas Constitution, courts use a balancing test to assess the relative burdens on the parties' rights and the importance of the state interests involved.*

Unlike most constitutional challenges that implicate only one constitutional provision, the parties' arguments regarding the Kansas ballot laws implicate three sections of the Kansas Constitution that intertwine in the election context:

- Section 3 of the Kansas Constitution Bill of Rights enshrines this state's constitutional protections relating to assembly and association, stating: "The people have the right to assemble, in a peaceable manner, to consult for their common good, to instruct their representatives, and to petition the government, or any department thereof, for the redress of grievances."

- Section 11 of the Kansas Constitution Bill of Rights protects speech rights, stating that "all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such rights."

- Article 4, section 1, of the Kansas Constitution vests the Kansas Legislature with the authority to define the procedures and methodology for conducting statewide elections: "All elections by the people shall be by ballot or voting device, or both, as the legislature shall by law provide." See also *League of Women Voters v. Schwab*, 318 Kan. 777, 797, 549 P.3d 363 (2024) (*League II*) ("Where popular elections are required . . . the mode, form, and rules governing those elections are

10

constitutionally delegated from the people to their free government in concrete constitutional commands.").

Not surprisingly, the parties disagree as to how these three constitutional provisions should be analyzed.

The plaintiffs focus on their rights to speech and assembly. They argue that the ballot statutes have the collective effect of preventing them from speaking individually and collectively as a party, as they provide a strong incentive for candidates to decline a third-party nomination and appear only as a Democrat or Republican. The plaintiffs emphasize that the rights to assembly and speech described in the Bill of Rights are fundamental and thus subject to strict scrutiny—that is, restrictions on speech and assembly can only be upheld if they are narrowly tailored to address a compelling government interest. See *League of Women Voters v. Schwab*, 317 Kan. 805, 815, 539 P.3d 1022 (2023) (*League I*).

The defendants take a different approach, emphasizing the broad authority the Kansas Constitution grants the legislature to determine the appropriate ballot format and how the information on a ballot should be displayed. They point out that Kansas courts have long upheld legislative determinations regarding voting methodology under a "reasonableness" standard. See, e.g., *State v. Butts*, 31 Kan. 537, 554-56, 2 P. 618 (1884) (upholding statutory requirements for voter registration as long as they bear a reasonable relationship to the legislature's role under article 5, section 4, of the Kansas Constitution). The defendants argue that, given the historical and continuing importance of the legislature's prerogative in this context, the ballot laws should be upheld as long as they support legitimate legislative ends. See *League II*, 318 Kan. at 803.

In our view, these positions both fall wide of the mark because they fail to consider the important constitutional protections that arise when regulating elections

11

generally and ballots in particular. States have an important role in structuring and safeguarding elections to ensure elections are "fair and honest" and to impose "some sort of order, rather than chaos, . . . [to] the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974). Election and ballot laws "will invariably impose some burden upon individual voters"—specifically on their "'right to associate with others for political ends.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S. Ct. 156, 75 L. Ed. 2d 547 [1983]). "[T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433.

At the same time, the Kansas Constitution does not permit the legislature to enact statutes that infringe the rights to free speech and expression. Our Kansas Supreme Court has found that claims alleging violations of the freedom of speech or expression are subject to more exacting review than the *Butts* reasonableness analysis. See *League I*, 317 Kan. at 815-17; see also *League II*, 318 Kan. at 808-09 (applying a different analysis to the plaintiffs' speech claims than that applied to claims involving the right to vote). The plaintiffs here do not argue that the ballot laws violate their right to suffrage by imposing any extra-constitutional qualifications on their right to be a qualified elector. See *League II*, 318 Kan. at 800. Thus, the reasonableness test laid out in *Butts* does not apply.

In recognition of this tension, federal courts have adopted a balancing test to assess "whether a state election law violates" the speech and associational rights protected by the First and Fourteenth Amendments to the United States Constitution. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997). This balancing test—often called the *Anderson-Burdick* test after the Court's opinions in *Anderson*, 460 U.S. at 789, and *Burdick*, 504 U.S. at 434—weighs "'the character and magnitude of the asserted injury'" to the speech and association rights

12

that the plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

The establishment of the *Anderson-Burdick* test was motivated in part by federalism concerns—that is, by federal courts showing restraint in avoiding unnecessary interference with state election laws. See *Burdick*, 504 U.S. at 433-34. Those concerns are not present in a challenge to Kansas ballot laws based on provisions of the Kansas Constitution. But this case presents a related tension—one between the Kansas Legislature's chosen method of ensuring fair and equitable elections and the speech and associational rights of the plaintiffs. And *Anderson-Burdick*'s sliding scale is similar to tests evaluating whether a practice violates the constitutional guarantee of equal protection or other substantive constitutional rights—tests that seek to balance the articulated governmental interest against the import of the rights asserted. See *Hodes & Nauser v. Kobach*, 318 Kan. 940, 950, 551 P.3d 37 (2024) (explaining why strict scrutiny applies to evaluate infringements of the fundamental right to personal autonomy under section 1 of the Kansas Constitution Bill of Rights); *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 316, 255 P.3d 1186 (2011) (discussing the levels of scrutiny for equal-protection claims).

We conclude that the analysis articulated in *Anderson* and *Burdick* strikes the appropriate balance between the constitutional interests at stake in this case and adopt it here. In doing so, we recognize that some courts have criticized a few recent cases applying the *Anderson-Burdick* test as imprecisely amorphous and overly deferential to state interests. See, e.g., *Montana Democratic Party v. Jacobsen*, 416 Mont. 44, 55, 63, 545 P.3d 1074 (2024) (declining to adopt the *Anderson-Burdick* test when assessing a violation of the right to vote under the Montana Constitution). But as a state court adopting the balancing test in the context of assessing a potential conflict between

13

provisions of our state Constitution, we are not bound by federal decisions interpreting federal law—while those cases may be persuasive, they are not controlling; we trust Kansas courts to separate the wheat from the chaff. And any constitutional standard necessarily involves some level of flexibility to allow courts to apply the principles embodied by our charter to modern problems. On the whole, the need to balance competing constitutional principles outweighs these concerns.

When presented with a potential conflict between the state's charge with determining the methodology of elections and an allegation that the chosen methodology impermissibly infringes the right to speech and assembly under the Kansas Constitution, Kansas courts must weigh the nature and severity of the burdens the challenged laws impose upon the plaintiffs' rights against the state's interests in adopting those laws. See *Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 434.

- Ballot laws imposing severe burdens on plaintiffs' rights are subject to strict scrutiny; they may be upheld only when they are narrowly tailored and advance a compelling state interest.

- When the burdens imposed are less severe—when the challenged ballot law imposes only reasonable, nondiscriminatory restrictions on the plaintiffs' rights and leaves open alternative avenues for expressing the plaintiffs' views—the state's important regulatory interests are sufficient to sustain those requirements.

- When the ballot law imposes only slight burdens (or no burdens) on the plaintiffs' expression, those laws (like any other voting laws) should be upheld so long as they bear a reasonable relationship to the legislature's regulation of voting methodology under the Kansas Constitution and support legitimate ends. See *League II*, 318 Kan. at 803.

Thus, the rigorousness of our inquiry into the propriety of the ballot laws challenged here depends upon the extent to which those laws burden the plaintiffs' rights to freedom of speech and assembly. We turn to those burdens now.

2. *The ballot laws impose reasonable, nondiscriminatory restrictions on the plaintiffs' rights to speech and association.*

The plaintiffs argue that the challenged ballot laws restrict their ability to speak and further their platform by making it practically impossible for them to select and nominate their preferred candidate. They note that United Kansas exists to promote mainstream political candidates in an era that has become increasingly politically polarized. In nominating a candidate who also has the support of the Democratic or Republican party, United Kansas would be able to further this collective goal and communicate to the voters their belief that a particular candidate meets these standards. The plaintiffs also argue that this practice would allow them—and voters who support the United Kansas candidate—to communicate their support for mainstream candidates to our elected leaders in a meaningful (and measurable) way at the polls.

But the requirements of K.S.A. 25-306(a) (requiring a candidate to accept the nomination for and have only one political party listed by their name on a ballot) and K.S.A. 25-613 (stating each candidate's name can be printed only once on a ballot) provide a practical disincentive for a candidate who has been nominated as a Democrat or Republican to accept the United Kansas nomination. The result, the plaintiffs assert, is that their realm of options for promoting their platform is diminished to two undesirable outcomes: They can nominate a candidate who does not have the support of one of the two main political parties and thereby all but ensure their supported candidate will not win the election. Or they can opt not to nominate anyone for the ballot and instead campaign for *another* party's nominee. In either case, the plaintiffs' primary political

15

goals—communicating when major candidates have their support and measuring that support through votes cast at the ballot box—are undermined.

The plaintiffs thus argue that the challenged ballot laws thus limit their ability to speak and associate in ways that violate the Kansas Constitution Bill of Rights' protections for speech and assembly. In response, the defendants observe that the United States Supreme Court rejected a challenge under the First and Fourteenth Amendments to the United States Constitution to a near-identical Minnesota ballot provision in *Timmons*. They argue that the *Timmons* analysis should control our decision here, as Kansas courts have historically treated the speech protections under the Kansas Constitution to be coextensive with the First Amendment. The plaintiffs counter that the text and history of sections 3 and 11 of the Kansas Constitution Bill of Rights show that those provisions provide greater protection for political speech and association than the First Amendment, so the analysis in *Timmons* does not fully comprehend the importance of the plaintiffs' rights at stake. They assert that if we are to balance their rights against the state's interests, we must first ascertain the nature and extent of these rights.

It is a fundamental tenet of federalism that state courts may interpret provisions of their state constitutions independently from how federal courts might interpret similar or corresponding provisions of the United States Constitution. See *State v. Lawson*, 296 Kan. 1084, 1090-92, 297 P.3d 1164 (2013). This tenet makes sense, as the language in state constitutions often varies—sometimes substantially—from the language in the federal Constitution. Indeed, the provisions of the state and federal charters were often adopted at different times for different reasons. And the text and history of a constitutional provision is paramount to ascertaining its meaning. As the Kansas Supreme Court explained 150 years ago:

> "'[T]he best and only safe rule for ascertaining the intention of the makers of any written law, is to abide by the language they have used; and this is especially true of written

16

constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing.'" *Wright v. Noell*, 16 Kan. 601, 607, 1876 WL 1081 (1876).

This is not to say that all state constitutional provisions warrant independent analysis from parallel federal counterparts. In some instances, for example, a state constitution may intentionally incorporate a federal right by reference or by adoption of its language. See *State v. Petersen-Beard*, 304 Kan. 192, 210, 377 P.3d 1127 (2016) (noting court's "general practice of giving an identical interpretation to identical language appearing in both the Kansas Constitution and our federal Constitution"). In other instances, the history surrounding the adoption of a state constitutional provision demonstrates the state intended to adopt the principles surrounding a similar federal constitutional provision, either in lockstep or at a discrete point in time. See *State v. Wittsell*, 275 Kan. 442, 446, 66 P.3d 831 (2003) (protection against double jeopardy in section 10 of the Kansas Constitution Bill of Rights "'equivalent to'" that in United States Constitution); *State v. Hall*, 65 Kan. App. 2d 369, 374, 564 P.3d 786 (amendments to section 4 of the Kansas Constitution Bill of Rights' right to bear arms incorporated the interpretation of the Second Amendment prevalent when those amendments were ratified in 2009), *rev. denied* 320 Kan. 864 (2025).

But we agree that before we are able to balance the rights and interests here, we must determine the nature of both.

2.1. *While the Kansas Supreme Court has left open the possibility that section 11 protects speech that otherwise would not be protected under the First Amendment, the plaintiffs have not shown they are entitled to greater protection here.*

We first consider the plaintiffs' argument that the text of the Kansas Constitution provides greater protection for freedom of speech and expression than the First

17

Amendment to the United States Constitution. Section 11 of the Kansas Constitution Bill of Rights provides:

> "The liberty of the press shall be inviolate; and all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such rights; and in all civil or criminal actions for libel, the truth may be given in evidence to the jury, and if it shall appear that the alleged libelous matter was published for justifiable ends, the accused party shall be acquitted."

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I.

The plaintiffs correctly point out that although both these provisions seek to protect freedom of expression, those rights are phrased differently. The First Amendment restricts limitations on the right to speech by the government—that is, it describes a right to express oneself free from governmental interference—while section 11 enshrines a natural and positive right to speak.

The Kansas Supreme Court recognized this distinction in *State v. Russell*, 227 Kan. 897, 899-900, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980), yet observed that "[t]he two constitutional provisions are generally considered coextensive." More recently, the court appeared open to revisiting this question, stating the difference in language "may support" a claim that "the Kansas Constitution provides even broader protection [for speech and expression] than the federal Constitution." *League I*, 317 Kan. at 815. The court found it unnecessary to address the question under those facts, as the plaintiffs in that case had stated a cognizable claim under First Amendment jurisprudence. 317 Kan. at 815.

Like the *League I* court, we recognize that it is possible that the textual differences in section 11 and the First Amendment open the door to the possibility that section 11

18

may protect broader speech or expression than its federal counterpart. But the mere possibility that a state constitutional provision could provide greater protection in some instances does not mean that the state and federal protections differ meaningfully here. The plaintiffs point to nothing in the text or history of these provisions that would show a meaningful difference in this case. Accord *State v. Boysaw*, 309 Kan. 526, 536-37, 439 P.3d 909 (2019) (declining to conduct an independent analysis under the Kansas Constitution when the party did not sufficiently develop the argument). And the textual difference between the two provisions seems inapposite when the plaintiffs are challenging what they claim to be a government restriction on expression—the conduct at the heart of the First Amendment's protections.

In short, the parties appear to agree that the ballot laws challenged here at least implicate the plaintiffs' rights to speech and expression in that they impose limitations on United Kansas' ability to nominate candidates for office and thus to some extent limit the messages United Kansas can provide to voters and elected officials. But the plaintiffs have not demonstrated that section 11 of the Kansas Constitution Bill of Rights provides greater protection for their expression at the ballot box than the First Amendment.

2.2.  *Section 3 of the Kansas Constitution provides greater protection than the First Amendment for the plaintiffs to assemble and present their political views.*

We next turn to section 3 of the Kansas Constitution Bill of Rights: "The people have the right to assemble, in a peaceable manner, to consult for their common good, to instruct their representatives, and to petition the government, or any department thereof, for the redress of grievances." In contrast, the First Amendment states that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

As with section 11, the association protections in the Kansas Constitution are positive—recognizing rights of the people to assemble, rather than placing limitations on the government's ability to prevent someone from exercising that right. But that is not the only difference between these provisions. Unlike the First Amendment, section 3 articulates the right of the people "to consult for their common good" and "to instruct their representatives."

The plaintiffs argue that Kansans' decision to include this language when the Kansas Constitution was ratified demonstrates a recognition of the importance of political parties, which allow people to associate, aggregate their views for the common good in a party platform, and communicate that platform to the people's elected leaders. They note that the text and history of the First Amendment did not anticipate such broad protections.

For support, the plaintiffs primarily argue that political parties played a much more prominent role in electoral politics in 1859, when the Kansas Constitution was ratified, than at our nation's founding. They point out that in 1791, most votes were conducted in person by voice. See *Burson v. Freeman*, 504 U.S. 191, 200, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) (plurality). But when Kansas became a state in 1861, most votes were conducted by party ballot, and it was common for multiple parties to nominate the same person for office. See *Simpson v. Osborn*, 52 Kan. 328, Syl. ¶ 2, 34 P. 747 (1893); see also Lee, *Anti-Fusion Election Laws in Populist Kansas*, 46 Heritage of the Great Plains, 9, 15 (Winter 2014).

As the defendants observe, the fact that Kansas law may provide broader protections for some party activity does not mean that the legislature cannot impose any restrictions on balloting structure. (Indeed, at the same time Kansans ratified section 3, they also clarified that "the legislature shall by law provide" the ballot method for elections. Kan. Const. art. IV, § 1.) And the plaintiffs are not arguing that the state should

20

give up its role in the ballot process and return to the party ballot, despite its prevalence at the time the Kansas Constitution was ratified. Instead, they appear to be willing to recognize that the legislature may regulate political parties' activities with regard to ballots to some extent. But they argue that the ballot laws adopted in 1901 crossed the line of permissible state action and infringed upon their assembly rights.

We conclude that these concerns go to the nature of the burden imposed by the ballot laws on the plaintiffs' assembly rights under section 3, not on whether the laws potentially implicate those rights. On the whole, we agree that the difference in language and history between section 3 and the First Amendment demonstrates an intention to protect a broader array of assembly rights under Kansas Constitution than under federal law. The ballot laws challenged here at a minimum implicate the plaintiffs' rights to assemble under section 3.

> 2.3. *Though the ballot laws implicate the plaintiffs' rights to expression and assembly under the Kansas Constitution, the burdens imposed on those rights are not so severe to warrant strict scrutiny.*

Because the ballot laws implicate the plaintiffs' rights to freedom of expression and assembly under the Kansas Constitution, we must now examine the extent to which the ballot laws burden those rights. The plaintiffs do not distinguish between the burdens imposed under section 3 and section 11 of the Kansas Constitution Bill of Rights. Instead, they argue that the challenged laws violate both provisions by effectively preventing United Kansas from nominating their preferred candidate for political office.

Our analysis is again grounded in history. The framers of the Kansas Constitution decided by formal vote to use the Ohio Constitution as a prototype for our charter. Heller, The Kansas State Constitution, p. 8 (2011). The Ohio Constitution contains a nearly identical provision to our section 3: "The people have the right to assemble together, in a peaceable manner, to consult for their common good; to instruct their Representatives;

21

and to petition the general assembly for the redress of grievances." Ohio Const. art. 1, § 3. The Ohio Constitution also contains a positive right of expression with wording very similar to our section 11. Compare Ohio Const. art. 1, § 11, with Kan. Const. Bill of Rights, § 11.

In 1896—long before the advent of the balancing test articulated in *Anderson-Burdick*—Ohio's Supreme Court held that an Ohio voting law that prevented a candidate's name from appearing more than once on the ballot did not violate article 1, section 2, or article 5, section 2, of the Ohio Constitution. *State ex rel. Bateman v. Bode*, 55 Ohio St. 224, 232-33, 45 N.E. 195 (1896). The Ohio court explained that "some voters may be somewhat inconvenienced by reason of the name of each candidate appearing but once upon the ballot; yet such voters *are not thereby deprived of any protection or benefit in casting their ballot*." (Emphasis added.) 55 Ohio St. at 231. The court found that this "slight inconvenience to the voter should be endured, rather than permit the advantage which one candidate has over another when the name of one is placed upon the ballot twice, and the name of the other but once." 55 Ohio St. at 231.

In reaching this conclusion, the *Bode* court acknowledged that—like Kansas—Ohio previously allowed candidates to appear "as many times as nominations of the same person had been made by different parties." 55 Ohio St. at 232. But the court explained that although the legislature had the authority to authorize fusion voting, that fact "ha[s] no bearing upon the question as to whether the general assembly has the power to prohibit the names from appearing more than once upon the official ballot." 55 Ohio St. at 232. In other words, Ohio's previous practice of allowing fusion voting did not foreclose the ability of the legislature to change its ballot procedures.

Other states that have considered challenges to antifusion laws under similar freedom of assembly provisions that mirror section 3 of our Bill of Rights have reached the same conclusion. See, e.g., *Working Families Party v. Commonwealth*, 653 Pa. 41,

68-69, 209 A.3d 270 (2019) ("Appellants . . . were able to meet and decide that the candidate who best represented their values was Rabb. They then had [the] opportunity to participate fully in the political process, culminating in casting their votes for the candidate of their choice."). And as we have noted, the United States Supreme Court ruled in *Timmons*, 520 U.S. at 363, that under *Anderson-Burdick*'s framework, Minnesota's antifusion laws did not impose a severe burden necessitating strict scrutiny.

The plaintiffs ask this court to reach a different conclusion, specifically focusing on *Timmons* and arguing that the Supreme Court failed to recognize the importance of the associational rights of the plaintiffs there. For example, they point out that *Timmons* considered whether other avenues for engaging in the challenged speech were available when determining the burden that antifusion laws place on minor parties. Plaintiffs contend that this analysis was erroneous because the general rule in freedom of association and speech cases is to allow the speaker to control the method and content of their messages. See *Reno v. ACLU*, 521 U.S. 844, 880, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997).

In *Timmons*, a Minnesota state representative running unopposed in the Minnesota Democratic-Farmer-Labor (DLF) Party's primary was also chosen as the nominee for the New Party for the same office. Minnesota, like Kansas, prohibits fusion candidacies, so local election officials refused to accept the New Party's nomination. The New Party sued, "contending that Minnesota's antifusion laws violated the party's associational rights under the First and Fourteenth Amendments." 520 U.S. at 355. The district court granted summary judgment to the state, but the Minnesota Court of Appeals reversed, finding that "Minnesota's fusion ban 'unquestionably' and 'severe[ly]' burdened the New Party's 'freedom to select a standard bearer who best represents the party's ideologies and preferences' and its right to 'broaden the base of public participation in and support for [its] activities'" and did not pass strict scrutiny. 520 U.S. at 355-56. The Supreme Court disagreed. 520 U.S. at 359.

23

The *Timmons* Court reasoned that the New Party has "the right to select the New Party's 'standard bearer.'" 520 U.S. at 359. But that does not mean "a party is absolutely entitled to have its nominee appear on the ballot as that party's candidate," as that person "might be ineligible for office, unwilling to serve, or, as here, another party's candidate." 520 U.S. at 359. The Court noted that the New Party was "free to try to convince [the candidate] to be the New Party's, not the DFL's, candidate." 520 U.S. at 360. And "[w]hether the party still wants to endorse a candidate who, because of the fusion ban, will not appear on the ballot as the party's candidate, is up to the party." 520 U.S. at 360.

The *Timmons* Court rejected an argument similar to that raised by the plaintiffs in this case—that the Minnesota ballot laws created a "'no-win choice'" between voting for candidates that could not realistically win, defecting from their party and choosing to vote for a major party candidate who could win, or choosing not to vote at all. 520 U.S. at 360. The Court found that the ban on ballot laws did not "directly preclude[] minor political parties from developing and organizing" or exclude "a particular group of citizens, or a political party, from participation in the election process." 520 U.S. at 361. Instead, the "New Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen." 520 U.S. at 361. And "party members may campaign for, endorse, and vote for their preferred candidate even if he is listed on the ballot as another party's candidate." 520 U.S. at 363. These findings led the Court to "conclude that the burdens Minnesota imposes on the party's First and Fourteenth Amendment associational rights—though not trivial—are not severe." 520 U.S. at 363.

While the Supreme Court's reasoning in *Timmons* is not binding on our analysis under the Kansas Constitution, we find it persuasive. The district court here reasonably found that nothing in the challenged ballot laws "prohibits or prevents Plaintiffs from expressing support—financial or otherwise—for [United Kansas] and its preferred

24

candidates at every stage of the race" as "[t]he full range of activities available to communicate such support is open to them, including identifying their preferred candidates as the endorsed nominees of the party." The challenged laws do not severely restrict United Kansas candidates' access to the ballot because United Kansas has a right to nominate the candidate of its choice on the general election ballot, and its candidate will appear on the ballot if the candidate has not already been nominated as the candidate of another party or does not decline the United Kansas' nomination. As the district court noted, a "candidate's affirmative and strategic choice to forego the minor party's nomination does not translate into a free speech injury to the party, its candidate, the voters or anyone associated with the party."

We recognize that the continued ability to support a candidate does not directly address United Kansas' more strategic aim—to convey to the voters and elected officials a message about Kansans' support for moderate candidates. But this aim presumes that the state has an obligation to publish and disseminate United Kansas' speech through its ballot. We, like the *Timmons* Court, are unpersuaded by United Kansas' "contention that it has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate. Ballots serve primarily to elect candidates, not as forums for political expression." 520 U.S. at 363. We find that the speech and assembly protections in the Kansas Constitution, like the First Amendment, do "not create an affirmative duty upon the government to act." *Gartner v. United States Information Agency*, 726 F. Supp. 1183, 1188 (S.D. Iowa 1989).

We, like other courts that have considered this question, are cognizant of the ways the ballot laws have affected the plaintiffs' desired avenue to express and disseminate United Kansas' message. But though the ballot laws may prevent United Kansas from using fusion voting to assemble and communicate its position to the public, numerous other avenues remain available and effective for delivering that message. In other words, the ballot laws impose burdens on the plaintiffs' rights to speech and association, yet

25

those burdens are not severe. We thus must determine whether the state has important regulatory interests to justify imposing those burdens.

2.4. *The district court did not err in granting the defendants' motion to dismiss, as the plaintiffs failed to state a claim upon which relief can be granted.*

In *Timmons*, the Court discussed several interests that might support antifusion ballot restrictions. We need not discuss all those interests here, as we find two—"preserving the integrity of the election process" and "avoiding voter confusion"—sufficiently important to justify the Kansas ballot rules. 520 U.S. at 364.

As both parties have recognized, Kansas enacted its fusion voting rules in 1901 after a series of elections marked by fraud and chaos. In the wake of this turmoil, the Kansas Legislature decided to take action to protect the integrity of elections in our state—to first do away with the party ballot and then to define the structure of the ballot itself. The restrictions that the plaintiffs challenge here are tailored to meet those concerns. By requiring candidates to choose one party nomination, the legislature worked to prevent the problems that arose when, for example, William Jennings Bryan was nominated by multiple parties with different running mates. In stating that each candidate could be on the ballot only once, the legislature ensured that all candidates were placed on equal footing in the voting booth.

The plaintiffs argue that the state had other avenues available to address these aims. And they assert that even if there was a need to address these issues in 1901, modern safeguards protecting elections largely mitigated those concerns. But these questions are matters of policy for the legislature, not questions for the courts. The state's interest in protecting the integrity of the democratic system justifies the ballot restrictions here.

And we are also persuaded that the ballot laws continue to serve an important role in preventing voter confusion. If the state were to allow parties to appear multiple times on a ballot under different party nominations, voters may be unclear as to how they should proceed. Do the voters endorse a candidate once? Or every time that person appears on a ballot? And if a person votes for the candidate multiple times on the same paper ballot, will that ballot be counted? At a time when Kansans use both paper and electronic balloting, these questions raise concerns not only about voter understanding but also the potential for differences in treatment across different parts of the state, or based on whether a person is filling out a paper advance-voting ballot or voting in person.

The plaintiffs assert that the four states that allow fusion voting have a process that accounts for these issues, mitigating their concern. But the fact that a state has chosen a different policy path and has taken steps to safeguard its ballot process under that path does not mean that Kansas is constitutionally compelled to do the same.

The United States Supreme Court has observed that "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick*, 504 U.S. at 441. The challenged ballot laws provide that structure here. We find that these laws serve important state interests that justify the burdens placed on the plaintiffs' desired avenue of communicating the United Kansas party's goals. The district court did not err when it found the plaintiffs did not succeed on their claims.

Affirmed.